D. F. JONES CONSTRUCTION COMPANY v. MIZE.

4-6160                                    146 S. W. 2d 709

Opinion delivered January 20, 1941.

*Abe Collins,* for appellant.

*Byron Goodson,* for appellee.

GRIFFIN SMITH, C. J. D. F. Jones Construction Company, a corporation, and Bill Walker, have appealed from a judgment for $3,000 given to compensate personal injuries sustained by Luther Mize when he was struck by a truck driven by Walker, August 9, 1939.

On behalf of the construction company, which for convenience will hereafter be referred to as the Company, it is insisted that the accident occurred while the state highway department was surfacing highway No. 27 between Nashville and Mineral Springs; that a mixing machine, hereafter referred to as the machine, was owned by the Company, but had been leased to the state under a contract for operation on a rental basis of twenty cents per cubic yard for all materials mixed by use of the machine; that the Company had no supervision or control over the machine or any of the men engaged in operating it; that the truck driven over appellee's foot by Walker was owned by Paul Jones, a brother of D. F. Jones,[1] and that the Company had no interest in its operation or control over its movements; that Walker was employed by Paul Jones; that Paul Jones owned two trucks and independently contracted with the highway department to haul asphalt from point of supply to the machine and was paid three-eighths of a cent per gallon for the services of his men and use of the trucks, and therefore in no event could the Company be liable

---

[1] D. F. Jones is president of D. F. Jones Construction Company.

for the injury even if Walker's negligence should be established.

Ray Tilley, the Company's secretary, testified he drew pay checks for Company employes. Payment of $17.32 to Adrian Walker [2] is evidenced by the Company's check of August 8, 1939. A similar check is dated August 15, 1939. The checks include services for the week ending August 12, 1939. C. F. McAllister was driver of the other truck owned by Paul Jones, and payment to him was by the Company.

A letter addressed to Tilley, sent from Augusta, April 22, 1939, and signed by Paul Jones, is printed as a footnote.[3] Jones wrote from Fayetteville, August 10, 1939, addressing J. C. Baker as district engineer for the state highway department, as shown in the footnote.[4] These letters were introduced as exhibits to the testimony of Tilley, who said a copy of Jones' letter to Baker was received by the Company in Little Rock "about the 11th or 12th of August." Wages of the two drivers were paid each week. The Company collected from the state all sums earned by Paul Jones for work done on the Nashville-Mineral Springs job. Jones was given credit for the state checks or vouchers, and was charged with payments made to the drivers. It was Tilley's understanding that Jones was personally indebted to the Company.

Bill Walker testified he was employed by Howard Jones, brother of Paul and D. F. It was Walker's understanding that Howard had charge of Paul's trucks. Witness began work in February, 1939. He was directed by Howard to go to the Nashville-Mineral Springs job. This

[2] Adrian Walker is the "Bill" Walker who is one of the appellants herein.

[3] "I have decided to keep Walker and McAllister on my truck and have made arrangements with them to work for $17.50 per week straight time while they are on the asphalt haul. I have instructed them to get tickets on all gas, oil and repairs and to mail them to me. If it is O. K. I wish you would send these boys a check each week for their wages and deduct the amounts from the truck earnings."

[4] "In lieu of advances previously made to me you are hereby authorized and instructed to make checks due me for asphalt haul on your Mineral Springs-Nashville job payable to the D. F. Jones Construction Company, Inc., and to mail them said checks."

occurred some time in August. There is this testimony by Walker:

"I worked over there until that job was finished, driving a truck, hauling asphalt the same as when I worked in Sevier county. Howard Jones was foreman on the Sevier county job and told me to go to Howard county. . . . He told me he was employing me to drive Paul Jones' trucks for him. I later talked with Paul Jones about it and he told me I was working for him, and not for D. F. Jones Construction Company— that I was working for him individually. The conference [with Paul Jones] was had at Smackover in April, 1939. During the time between February and April I had been working at Lockesburg. Howard Jones was not foreman, although he had put me on the truck. He just put me on the truck to drive."

Appellee testified that the machine behind which he was working was about eight or ten feet wide and twenty-five or thirty feet long. It was higher than a man's head. A "chute" came over the back of the machine and dumped asphalt after it has been mixed. Witness worked "backwards and forwards" under the chute. The machine was self-propelled "down the center of the highway," and made a "terrible" noise. The manner in which it functioned was described as follows: "The hopper on top grinds a mixture of oil, gravel, and sand, all the time and is supplied by an automobile truck through a hose and a pump. The truck is right up by the side of the machine and is hooked on in the middle by a hose extending into the hopper. The truck was also attached by a chain. The machine rolled all the time, and after the truck was tied on it was continuously moving at the rate of eight or ten feet a minute."

Appellee had been working on the Nashville-Mineral Springs job "four or five days" when injured. He was sweeping behind the machine. His position was "right behind the wheel under the chute, which is about two feet higher than a man's head. The chute was about four and a half feet from where the wheels are to where the mixture was poured out. I was working in a space about

eight or ten feet backward, two and a half feet from where I was working to where the mixture came out of the chute.''

Additional testimony of appellee was to the effect that the oil truck driven by Walker was on the left of the machine and work was progressing in a northwesterly direction. It was customary to drive a truck in from the rear and attach it to the machine. There was always a truck in waiting. When contact was made it required from forty-five minutes to an hour for discharge of the load. The exact manner in which the injury occurred is quoted from appellee's testimony in the fifth footnote.[5]

Appellee testified that Howard Jones ''wanted to rush up the work.'' There is the statement that prior to the injury Howard had changed the machine's gears in order to accelerate work. At first the coverage was six and a half feet per minute. On August 9th, ten and a half feet per minute were being covered. The witness saw Howard Jones on the job ''four or five times. Sometimes he stopped the machine, and at other times he told me to hurry. He would tell the men on the machine to hurry.''

Dewey Putnam, who was working on the road job, testified there was nothing to have prevented appellee from seeing the truck when it backed in. It was moving quite rapidly, and appellee was concentrating on his work. There was the statement by this witness that ''I never saw the truck back this far before when I was on the job.'' He also said: ''There was supposed to be a boy helping Mize, but he was not there.'' No signal was given by Walker when he backed the truck.

[5] ''At the time I was injured I was sweeping behind the machine. The material is sometimes thick and heavy. I was sweeping eight or ten feet all the time. I had to keep it where this asphalt poured out over the back with my back to the roller, and four or five men picked it up in front and hauled it off. I think six men worked over there. As I stepped back to get a new 'sweep' I would take about two feet, and I got a new hold and the truck caught me. . . . The truck was about two and a half or three feet too far when it caught me. I think the truck backed into the machine. When you are sweeping you can't see anything backward or anything in front of you unless you step back out of the road. I did not know the truck was backing up there. . . . There would have been sufficient room for the truck to back [up to the machine] and to have unloaded the oil without striking me.''

There was other testimony relating to the manner in which the injury occurred. Evidence was introduced in an attempt to show that appellee's misfortune was caused by his own negligence in not keeping a lookout for the truck. He knew, of course, that from time to time these trucks were backed into position and connected to the machine. Opposing this testimony is the fact that the machine made considerable noise; that the program called for rapid operation, and that appellee had a right to assume a truck would not be backed into him at the point he was supposed to be at work. Whether this was or was not done is a question for the jury, and we are not willing to say there was not substantial testimony to support the allegation of negligence; nor can it be said there was no evidence to show that appellee did not contribute to the event.

D. F. Jones testified that Paul Jones did not own stock in the construction corporation, nor was he an employe. The Company owned the mixing machine and rented it to the highway department by verbal agreement with W. W. Zass, chief engineer, and J. C. Baker, district engineer. There was subsequent confirmation by letter.[6]

The witness was handed a note for $425 executed by Paul Jones, payable to D. F. Jones, December 31, 1936. Credits of $275 and $137 were indorsed on it. Payments were from checks received from the highway department accruing from services rendered by Paul Jones through use of the two trucks and drivers. D. F. Jones further testified there was a full accounting to Paul of moneys he earned in connection with the Nashville-Mineral Springs transaction. There was the further statement that ". . . there were some other things handled. The boy's wages were handled that way and he had some money earned that could be charged or credited as might be the case." There was denial that

[6] "This is to confirm our verbal agreement of some few days ago in regard to mixing of asphalt on Highway No. 27 between Nashville and Mineral Springs.

"Donald F. Jones to furnish one Barber-Green Mixing machine, state to furnish supervision, all labor, gas and oil at a unit price of twenty cents per cubic yard for all material mixed by said machine."

any attempt was made to direct operation of the machine. The witness also denied that Howard Jones had any connection with the undertaking. He admitted having been on the ground while the work was progressing, but insisted he only talked with Superintendent A. A. Brown of the highway department. On cross-examination there was the admission that Howard Jones "may have speeded up the machine at the request of Brown because he was familiar with it." And again: "I do not know whether Howard was on this job four or five times or more when the job only lasted seven or eight days."

Paul Jones testified he bought the trucks in 1938 and received them from Snapp Motor Company of Walnut Ridge about the first of the year. Bills of sale executed in February, 1939, were identified. State licenses for 1939 were issued in Paul Jones' name. He said A. Gregory made the deal with the highway department for use of the trucks on the Nashville-Mineral Springs job, the witness having authorized Gregory to act for him. A letter received from J. C. Baker, dated July 18, 1939, was introduced.[7] It was addressed to "Mr. A. Gregory, representing Paul Jones, private truck owner, Fayetteville, Ark." On cross-examination the witness testified as shown in the footnote.[8] Gregory confirmed Jones' testimony regarding the verbal agreement for use of

[7] "Confirming our verbal conversation of a few days back, I checked up, found that the state has no equipment for the hauling of the asphalt.

"You may authorize Mr. Paul Jones to send his trucks to Nashville and we will pay him the price of ⅜c per gallon for hauling asphalt on Highway No. 27 between Nashville and Mineral Springs. Mr. Jones to furnish trucks, drivers and pay all expense pertaining to this transportation."

[8] "Mr. Gregory acted as agent for me in making the agreement about these two trucks working over there on the Nashville job. I don't remember the first time I ever saw Bill Walker, but I believe it was in Little Rock. I think it was back in 1939 when the trucks were going from one job to another. He came through Little Rock and I saw him there for the first time, I believe. I knew him by name only before that. I knew it was my truck he was driving and he introduced himself to me. I knew he was working for me about two months before I met him. I think it was in Little Rock. Howard Jones put him to work on my truck. Howard is my regular agent, but I instructed Mr. Gregory to make this other deal. He is superintendent for D. F. Jones Construction Co. The only agents I have had are employees of the D. F. Jones Construction Co."

trucks, and subsequent confirmation by letter from Baker.

Paul Jones emphasized his agreement · with his brother, D. F.  There was confirmation of indebtedness evidenced by the note, and assertion that "I told him before the accident that any money the trucks earned over and above their expenses could be applied on this note.  .  .  .  This was the first surplus they had made. Everything up to that time had been applied on the payments of the trucks—I applied it.  .·  .  .  Howard Jones brought the trucks from Jonesboro to Sevier county."

Howard Jones denied he directed workers to go from Lockesburg to the Nashville-Mineral Springs job, but did tell them that if they went there would probably be work there for them:  "I was through with the equipment on the Lockesburg job when it was moved."[9]

· Bill Walker testified he stopped the truck at the regular place, and did not see appellee.  Paul Jones' name was on the truck, and witness had his name painted above Paul's.  When witness went on the job he reported to A. A. Brown, and worked under him.  In

[9] Howard Jones further testified: "I never did give any directions to the truck drivers when I visited the job.  I never undertook to control the employees operating the mixer.  Mr. Gregory told me about making a deal or making arrangements for these two trucks to haul some asphalt on the Nashville-Mineral Springs job and that the trucks were to go on a certain date or when the [mixer] went, and I told Walker and McAllister what Mr. Gregory had told me about the deal and for them to have the trucks in there for a certain time. I know that these trucks belonged to Paul Jones. . . . The reason I told the truck drivers is .that I didn't know whether he had seen them or not.  He said to tell them that he had made arrangements for Paul and that was the next job for the trucks.  I had no authority to tell them to do that for D. F. Jones Construction Company.  When the Mineral Springs job was finished some of the boys asked me for some money to pay their board bills.  They were going to leave with the machine and I told them I would see what I could do, so I called D. F. Jones at Little Rock and asked him if he would be willing to loan these .boys some money and Mr. Brown said he would issue slips of their time and would furnish Mr. Jones with the slips, and they all agreed that if Mr. Jones would advance them some money, or the full amount, they would assign their checks to him.  Mr. Andy Brown said it would be satisfactory.  He was the one who issued these statements of the amounts they were due. . . . I didn't tell any of the boys on the job to hurry up.  I didn't tell anyone to adjust the machine to make it go faster or slower, except Mr. Brown asked me what adjustments to make to get a certain speed.  I did not adjust the machine myself to speed it up."

describing the accident, Walker said he had backed in to hook on to the mixing machine. Concurrently the mixing machine moved up: "I would not have had to pull up if they had hooked on as quick as I backed up there." [10]

When recalled as a witness Tilley identified a letter written by the Company to Byron Goodson, attorney for appellee. It was dated December 15, 1939. Because of its importance as an aid in determining whether the Company or Paul Jones operated the trucks, it is printed in full in the margin.[11]

### OTHER FACTS—AND OPINION.

It will be observed that in the Company's letter to Mr. Goodson the statement is made that "The state paid us a rental on a gallonage basis for the tank trucks, one of which was driven by Bill Walker at the time of the alleged accident." This, it would seem, is an admission

[10] Other testimony by Walker was: "I don't know why they pulled up, but I guess they were picking the boys up. [Appellee] was four or five feet behind the truck when they picked him up. . . . I am now working on Highways 1 and 29 in Paragould and Jonesboro. D. F. Jones pays my checks. I am still driving the same truck."

[11] "We have before us a copy of the complaint of Luther Mize v. Bill Walker and D. F. Jones Construction Company.

"For your information your client Mize, as well as Walker, and other employees on the construction where the alleged accident occurred, were employed at that time by the State Highway Department since we were not on a contract job but were mixing some paving material for the maintenance division of the State Highway Department. Luther Mize and others were paid their wages by state although we advanced the amounts due the respective employees as a matter of convenience to them and so they would not have to wait a period of two or three weeks to get their money from the state through the regular course. The state paid us a rental on a gallonage basis for the tank trucks one of which was driven by Bill Walker at the time of the alleged accident. We are reliably informed that the State Highway Department through L. B. Leigh & Company, local representatives of their insurance carrier, has paid or has approved for payment a claim of Mize for compensation allegedly due as a result of an accident to him and the subsequent loss of time from his work.

"We wish to call your particular attention to paragraph VI of the complaint wherein it is stated the plaintiff was earning the sum of $20 per week from employment on the highway construction projects. The wage scale on that type of work at that time was 25c per hour with a maximum of 44 hours per week allowed so you can readily see that he would not earn $20 per week.

"We will appreciate your informing us whether or not your client has already received compensation from the state because under the conditions as above set forth we must respectfully deny liability in the case."

that the trucks were being operated by D. F. Jones Construction Company. "Us" can only have reference to the Company, since the letter is signed by the Company, by its secretary. The time was more than four months after the injury occurred. If this be true it is not important whether the mixing machine was operated by the Company, or leased to the state. The injury was occasioned by the truck driven by Walker, and the Company's understanding of the arrangements long after the controversy arose was that it supplied the trucks on a gallonage basis. It is true that at trial a different theory was advanced, but there is testimony in respect of certain transactions that tend to traverse the Company's assertions. We think, however, a question was presented for the jury, and its determination, based as it was upon substantial evidence, will not be disturbed.

It is argued that the court committed error in refusing to give certain instructions requested by the defendants, in modifying others that were given, and in giving certain instructions at the request of the plaintiff. [See twelfth footnote.] [12]

*First.* Instruction No. 1, if given, would have told the jury to find for the defendant, Bill Walker. For reasons heretofore expressed the instruction was properly refused.

*Second.* This instruction would have directed the jury to find for D. F. Jones Construction Company. We have quoted testimony showing there was substantial evidence connecting the Company with operation of the trucks, as disclosed by the letter of December 15, and otherwise.

*Third.* Appellants correctly state the law to be that there is a presumption defendants are not guilty of

---

[12] (1) The verdict is contrary to the evidence. (2) The verdict is contrary to the law. (3) The verdict is contrary to both the law and the evidence. (4) The verdict is wholly without substantial evidence to support it. (5) The court erred in giving plaintiff's Instruction No. 1. (6) The court erred in giving plaintiff's Instruction No. 6. (7) The court erred in refusing to give Instruction No. 1 as requested by the defendants. (8) The court erred in refusing to give Instruction No. 2 as requested by the defendants. (9) The court erred in refusing to give Instruction No. 12 as requested by the defendants. (10) The court erred in refusing to give Instruction No. 13 as requested by the defendants.

negligence, and the burden rests upon the complaining party to show to the jury, by a preponderance of the evidence, that negligence occurred. It is insisted that the only acts of negligence charged against either Walker or the construction company were (a) failure to keep a proper lookout, (b) driving the truck in such a careless and negligent manner as to strike plaintiff, (c) driving the truck in the space adjacent the machine where the truck was not supposed to be driven, and (d) driving the truck to a point beyond a point necessary to supply the oil to the mixing machine.

*Fourth.* It is contended that plaintiff's instruction No. 1 ignores the defense of contributory negligence and unavoidable accident, that it is in conflict with instruction No. 7 given on behalf of appellants, and did not tell the jury that before appellee could recover he must have been in the exercise of ordinary care for his own safety. The instruction, after using certain language in respect of which there is no complaint, contains the expression: "If you further find that the plaintiff, while in the exercise of ordinary care, was injured." The point is urged that the instruction should have required the jury, as a condition to recovery, to find that the appellee was in the exercise of ordinary care *for his own safety.*

It requires exceptional clarity of thought and singular facility of expression to phrase a sentence so all-inclusive and yet so simple that but one construction can be given it. Conceding that all of the elements in contemplation would have been more accurately presented if the instruction had been written as counsel for appellants would have drawn it, nevertheless we do not attach to the omission the importance stressed in appellants' argument in support of the exception, our view being that the jury was not misled to the prejudice of the defendants.

It is also insisted that the instruction was fatally defective in that the word "proximate" did not precede the word "caused" where it was said that ". . . the D. F. Jones Construction Company is liable for whatever damages to the plaintiff which may have been caused by the said negligent acts, if any, of the said Bill

Walker." The answer to this is that if Walker's negligent acts caused the injury, it is necessarily implied that negligence was the proximate, as distinguished from the remote, cause. It is inconceivable that the jury, in the light of testimony that Walker backed his truck in a careless manner, considered anything but the actual cause of the injury, and *that* cause necessarily was the proximate cause. There are cases, of course, where an efficient intervening cause produces the injury, and without which the injury would not have occurred. But that is not the case here.

It is next insisted that the court erred in giving appellee's instruction No. 6 because the word "fairly" does not precede "compensate" wherever it appears. It will not be presumed that the jury considered unfairly or disproportionately compensating the plaintiff because of failure of the judge to admonish against such conduct. A complete answer to this objection is that appellants do not complain that the judgment is excessive.

We have examined other assignments and hold that the matters excepted to were not errors of a character requiring a reversal.

Affirmed.