KANSAS CITY SOUTHERN RY. CO. *v.* McKENZIE.

5-427                                           269 S. W. 2d 326

Opinion delivered June 21, 1954.

*Hardin, Barton, Hardin & Garner,* for appellant.

*Bates, Poe & Bates,* for appellee.

GRIFFIN SMITH, Chief Justice. Dennis McKenzie was eleven years of age when on July 9th, 1953, a railroad signal torpedo exploded, causing injuries that necessitated removal of his right eye.[1] The railway company has appealed from a judgment for $1,500.

Although the McKenzies were residents of Scott county when the suit was filed, they had formerly lived at Heavener, Oklahoma, where the railroad company maintains switching and supply yards approximately three miles in length, and wide enough to accommodate thirteen tracks extending generally in a north-south direction. Some of the tracks are used in "storing and making up trains."

Along the mainline track there are supply stations where tools and parts used in servicing trains are kept. North of the depot there is an independently owned ice house. It fronts upon a highway. The rear end of the ice house is near the west line of the railway company's right-of-way. One of the supply stations is maintained near the ice house, but slightly south of it. A building known as the carmen's "shanty" is north of the depot, but south of the ice house. In addition there is a round-house and a storehouse. At the time the torpedoes were

---

[1] Although the boy is named in the complaint, the action was brought by his father, Johnnie McKenzie.

picked up by young McKenzie he lived with his family east of the yards.

There is evidence that Dennis had frequently crossed the yards in going to the ice house for his parents. Other youngsters did likewise. There were no well-defined paths to be followed after entering the yards proper, but a trail did lead by a storage tank. Two crossties spanned a ditch and were used by persons having business at the ice house. A photograph clearly shows that the ties formed a crude bridge over the depression or gulley, and there was testimony that this route was so frequently used that the railway company should have known about it.

Dennis testified that while residing at Heavener he made frequent trips across the railway yards. During warm weather he went almost daily for a twelve-pound block of ice. Frequently his 7-year-old brother, Bernice, would accompany him. They would loiter as children frequently do, stopping to play when something of interest attracted their attention. In making these trips railway employes were encountered, but no one had told the children to stay off the premises. In utilizing the cross-tie bridge Dennis and his brother passed near a little house used for storage purposes. Dennis had observed that the house was not kept locked, and often the doors were open.

In looking through the open door Dennis had seen ''some little old red square things,'' but at that time he did not know what they were. He had also seen them on the ground, and finally picked up two. This did not occur until he had passed them on one or two occasions. They proved to be torpedoes. Dennis carried them home because they were attached to lead that could be used for fishline sinkers. The torpedoes were placed in his fishing box and no further attention was given them for a month or more—not until the family had moved to Waldron. While trying to pry the lead away from one of the torpedoes it exploded, with the result heretofore mentioned.

The sole question is whether the defendant was entitled to an instructed verdict. Stated differently, was there substantial evidence of negligence?

Appellant concedes that Dennis' testimony placed one of the torpedoes between the rails of the main line track and the other on the shoulder of the roadbed, near a supply box. Neither was attached to a rail. But there is evidence that trainmen had access to the supply house and that when necessary they would procure the explosives.

Appellant's witnesses described the care with which torpedoes are handled, beginning with their removal from storage at Pittsburgh, Kansas, their shipment in sealed boxes, and delivery to the storehouse at Heavener where they are placed in charge of a keeper. Within the storehouse the torpedoes are taken from the sealed boxes and placed in a metal container. Appellant's keeper distributes the torpedoes to supply men in packages of six. The supply men, in turn, take the torpedoes to the so-called "shanty" where individual lockers are kept. As the supply men require torpedoes to be delivered to train operatives, (the trains are referred to as "cabooses") the torpedoes are taken from the lockers for delivery.

It is not customary to use torpedoes within yard limits unless a derailment has occurred. To discourage trespassing within the yards signs have been erected and are constantly maintained.

Appellant's sole attack on the judgment is that there was no testimony to show that the defendant had placed the torpedoes where they were found, or that its responsible representatives had reason to suspect that they were obtainable, hence the jury was permitted to infer that operatives had been negligent.

The close question is whether the inference is one that reasonable men would draw from established facts, —or was the verdict based on speculation and conjecture?

Appellant gives emphasis to the rule that under the law there is a presumption against negligence. *D. F. Jones Construction Company* v. *Mize,* 201 Ark. 702, 146 S. W. 2d 709. The difficulty in application is that there is substantial evidence that the torpedoes had been ob-

served in an insecure situation, and that sufficient time had elapsed for appellant's agents to have seen them. The testimony on this point may not be accurate, but it did present a jury question rather than one of law.

In *Missouri Pacific Railroad Co.* v. *Slatton*, 193 Ark. 356, 100 S. W. 2d 86, it was said that if one unnecessarily leaves an explosive so exposed that children have access to it—as, for example, where children play or are known to go—the person who left the explosive in that position will be responsible for consequential injuries. In the case at bar appellant insists that the roadmaster's testimony is conclusive on the question of care and that negligence must be ruled out. That might be true if the employee's witnesses had not been contradicted. True, no one said that the railway's custom was not what the trainmaster pointed to; but the injured boy's testimony, supported by others who knew that use of the premises by children had continued for a protracted period, was sufficient to establish negligent handling after the torpedoes passed from the storekeeper's control. With this factual background for the jury's consideration the next step was not a speculative or theoretical process of reasoning, but a natural inference resting on facts the jury was willing to accept.

We are not able to say that the court erred in refusing to instruct a verdict for the defendant-appellant.

Affirmed.